Morning. May it please the Court, Barrett Green for the School District. We submit that the District Court misconstrued the statutory framework. Under the District Court's construction, implementing an IEP to the extent possible within existing... Mr. Green, has... I want to say this name right. Is it Aja or Aja? How do you say it? I think... Aja. Aja. Okay, thank you. Some people call her Aja, though. Okay. I know that Mr. White has... Aja. Has Aja graduated now? She has not, actually. She was three units short of graduating and she stopped attending Westmark for some reason. Okay, so she stopped attending. That's my understanding. After, you know, she was three units short. The reason I ask that is because the council for the... Did you say Termine? Is that the name of the family? Termine. Termine. Termine, okay. The council for the Termine family has indicated that this is really all just a dispute about money at this point. Do you agree with that? No, definitely not. In fact, this case obviously has cost a lot more to the taxpayer than the dollar amount in dispute. It's a very important case because many students come from a non-public school to another school district that's able to implement the services without providing a non-public school placement. And there's an important issue about whether or not the school receiving school district must place that child in a non-public school. It's important for two reasons. One, because of Congress's preference for mainstreaming as opposed to placing children in isolation, which was the... That's not really the issue, the underlying issue here. It was the question whether the placement at heart was in conformity with the IEP that was in existence, which the Westmark placement was. And that's the real question here. If you want to go to the substantive question, but I've heard you argue this before, and I've heard your argument that the taxpayers are paying a lot of money for this litigation before. That's not a persuasive argument. It seems to me you guys have been spending a lot more time and a lot more of the taxpayers money litigating this than it would have cost to just put Asia in Westmark, which you did anyway. So... Right. And that's exactly what... But the real question is, you know, was the hearts placement and increase in time with the general population in conformity with the then existing IEP? Well, what Judge Wilson says is that we couldn't, that he said it appears that the district could not fully implement it because we didn't have a PE class in general education, special education. And that's in his decision at page 24. It says that... Counsel, wait a minute. You're going back to the October 3rd period of 2001. Is that correct? You're talking about the initial transfer? Well, part of it. But Judge Wilson is addressing whether it could... What page are you talking about? Page 24 of Judge Wilson's decision. It says it does not appear the district could have implemented the Glendale IEP by placing Asia at a public school within the district. That's right. And that's why he said that you were not in compliance with the act because what you needed to do was to leave her at Westmark. Right. And that's where he erred because the statute says, implement it to the extent you're able to. Right? So he said they weren't able to. And that's two issues. You're taking resources, but if you can't, you have to go... No, no, that's where he got it wrong. The statute says, because Johnson and Vachon both said, if you can't do it precisely, you don't have to pay for the same vendors. You don't have to recreate the program in Vachon. Of course, with unlimited money, you could do anything. So they couldn't have meant in Vachon, the Ninth Circuit couldn't have meant in Vachon, and it couldn't have meant in Johnson that one must implement the exact services. What they meant was, if you can't do it, you must do comparable services. And that's the exact words that were used in Johnson, and actually to confirm... I mean, it wasn't a construction matter, at least as I read Judge Wilson's opinion, so much as it was an application matter. I mean, he says, look, it simply wasn't similar to say someone who was spending 0% of her time in general education now was to spend 35% of her time in general education. I think there's two issues. One is a legal question, which is applying the terms of, you know, applying Johnson, Vachon, and 56325. What does it mean when we say implement it to the extent possible within existing resources? Does that mean if you can't implement it, you have to pay for the NPS? Or does that mean implement it to the extent you're able to, and if you can't implement some element, that's okay? That's one. That's the legal question. It's of very critical importance. But in the litigation, though, your school district has indicated that you placed, I don't remember the number, but there are many, many, many people that you place in private educational institutions in order to provide faith. Is that correct? I would say not many, many compared to the thousands or more that we have in special education. There may be 30 or 35. But the reality is your school district does provide education off campus with nonprofit certified private schools, right? Of course, yes. For a number of people. Yes. So that was a possibility. One question, whether you could afford it. The question is whether on the interim IEP that Glendale had agreed upon with the Terminator family, whether you complied on an initial basis, and then after the 30 days, whether you provided a faith as well. We can get to that. But what I want to find out is I want to work backwards because it seems to me from the record that I've seen that the school district agreed that in the school year 2004 to 2005, 2002 and 2003, that you agreed that the proper place for Asia to be was Westmark. Is that correct? No. No, we didn't agree with that. What we did is after. . . You gave up. You basically conceded that that was the fallback, right? I wouldn't say that, Your Honor. I'd say what the school district did is what a responsible governmental agency is, which is not to keep fighting 50 cases in a row and bring them before this court. There's one important policy issue at this point, and we didn't feel it was necessary to make our point to be fully consistent to keep coming back. But you agreed that the state put location was Westmark for those two school years, right? We agreed as of. . .  We agreed as of September, October of 2002 that we would fund Westmark. But we expressly reserved the right to go back and collect. But then later on in 2004, you agreed to do the same thing with respect to that year, right? No, because what we did is in 2003, we proposed an IEP that said, hey, we'll show you why we can educate Asia, and we'll offer transition services, et cetera. And when the hearing officer in that case said, well, she's been at Westmark so long at this point, she's so fragile, we can't remove her, we didn't challenge that. I mean, we challenged the conclusion, but we didn't do another IEP. But either because you didn't challenge it or because you agreed, once we get past, I think it's July 3, 2002, pretty much the school district, either because of whatever legal costs or deciding that that was the appropriate place for her to be, the state put location, did not really contest her being there and agreed to pay and did pay. Isn't that correct? As of for state put purposes, we've paid it as of 2002. And then after the second term in the decision, we didn't do another IEP. And we've never accepted that Hart District is unable to provide an appropriate placement. Because I only have a little bit of time, if I can address the legal issue. I realize that there's this question of why is the school district, you know, picking on this poor kid, but this isn't really what's going on here. I mean, Hart has award-winning special ed programs. There's two things. One is there is a rule that we're not supposed to place children in non-public schools unless we are unable to provide the services. Are you talking about, I mean, I know you just want to talk and have us listen, but I'm sorry. No, I understand. I just want to focus your argument on are you, this important principle you're trying to establish to this case, is that confined to this initial period that Section 56325A governs, that first 30 days? Is that what you're talking about? No, because. Because you don't finish that statute. It says you either do it to the extent possible or you do a new IEP, but you never did either one. Right. But the, well, there's connection to the second part, which is was the placement, could we have implemented it anyway? And that goes to, arguably, to the second case, but we don't have the second case on the merits before this panel because that case was dismissed as moot. But let me see if I can answer it this way. The Knight case in Knight v. District Columbia, which is cited in the briefs, the Court of Appeal and the D.C. Circuit said there's nothing inherently dissimilar between a public school district and a private school district. There's nothing, oh, it's a private school, it's got some unique component to it. In fact, in this case, there's absolutely no evidence in the record whatsoever of anything that Westmark has that Hart doesn't have, nothing. And you can't just say, oh, it's a nonpublic school, as though that is some kind of pill. Oh, she's got some unique, there has to be. I don't think, is anyone saying that? No, that's what they're saying. They're saying that it had to be in conformance with the existing IEP or you needed to do a new IEP, neither of which was done. Right. But there's two issues. One is, did we do it to the maximum extent possible? Judge Wilson is saying they did, they just couldn't do this other piece of it because there's no special ed, there was no special ed PE class. That's what Judge Wilson is saying. The other issue is, is it really correct to say that if you have PE lunch and recess not in a special day school, sorry, a private school, that that is somehow dissimilar? Put the private versus the public aside. Okay. Why do you say he was wrong on the general ed? Because for two reasons. Number one, it was never raised as an issue below. Well, here it was. I mean, the whole thing, the whole thing was at stake. The reality of these cases is one can say there's a denial of faith. That could mean thousands of things in these administrative hearings. They always focus on what the issues are. The hearing officer would have been able to say this is de minimis, the fact that they don't have a PE class. Or we could have made a PE class if that was that important. We could have developed the PE class if that was necessary, if anyone had ever raised it. I mean, this is the government. We've got five people in the special ed department dealing with a thousand special ed kids. They can't deal with this hide the ball, wait until the end, tell us a new argument about the PE class. That's number one. Number two, there's no evidence that it was a substantial part of the prior IEP to have PE in a special school. There's just nothing in the record at all on that. Well, let's assume for a moment that the terminators were completely unrealistic and high-handed and perhaps even fraudulent from time to time. Your school district, you've got capable counsel. Why didn't the school district comply with the law, produce the IEP required within the 30 days? Why did it let it just hang in there until July of 2002? Why didn't the school district keep a log like the statute provides where you're supposed to indicate when you contacted the parent or the attorney and build you a record, and then you could do your own IEP and then the record indicates that they would have had the right to have a due process hearing and complain from there. You didn't do that, counsel. Why not? The answer is I think the record is there about the log in terms of there's actual e-mail correspondence and letters, the evidence there. There's no IEP. You did not finalize the IEP, and the law says you must do that, right? Yes. To answer the second part of the question first, the log exists in that the letters and the e-mails are the log. To answer the first part of the question, another practical problem that school districts face every day. If you go ahead with an IEP without the parent, they sue you and say you went ahead and deprived me of my rights. If you document and don't go ahead, then you get this kind of decision where they come back and blame you for not doing it. And so, you know, this is the government. We're trying to implement the law to the best we're able to. It's not easy to do. So are you encouraging us to rule in a way that ignores the express language of the statute that says that you have to do the IEP? I appreciate your dilemma, and you're dealing with the terminates in this situation, but the fact is the law expressly requires you to do the IEP, and you chose not to do that. How does that help your case? How does that help you help us interpret the law in a way that is favorable to the school district? If we made a tactical decision, me as counsel, to try to have the IEP and not do it without them in order, because remember, we got this fax in September, you're violating the rights, I'm going to sue your clients personally for these things, then that's my fault. That's not, that doesn't mean necessarily that we should punish the district. The other part is 56325B is very clear. It says before the expiration of the 32-day period, the interim placement shall be reviewed by the IEP team. Okay? They didn't take the interim placement. My view is that you cannot not take the interim placement and then expect to have, and we argued this throughout the entire case, and I think it's the law that you cannot not accept the interim placement and then blame the school district for not holding the IEP, because what's supposed to be reviewed is the interim placement. So your answer to that was then to not hold another IEP meeting and do nothing on that for almost a year. That's correct. Do you think that's the correct legal interpretation? I do, because, for example, if a parent goes into a school district without an IEP, and for whatever reason the district says, okay, I'm going to start, before we start the IEP, we'll have this interim service while we're getting ready. The parent says no. Well, they don't have any rights. You can just, you know, they can go to a non-public school, do whatever they want, and they'll have to pay for it. So the law doesn't contemplate that parents can simply abandon the process and then. Doesn't the law contemplate that if you adopt your own IEP, they can have a due process hearing and claim that there's a problem? That's what you told me. They said they were going to do it anyway. So why didn't you do the IEP? We tried to do the IEP. You can do that unilaterally, counsel. Well, that's what the hearing officer told us, and if I could do it over again, I would, Your Honor, but that's the record we're stuck with at this point. I apologize, but I want to make sure I have some time for rebuttal, if that's okay. Thank you. Ms. Chaffney. Good morning. May it please the Court. Marcy Tiffany representing the Terminees. The issue that we wanted to focus on was the stay put versus the interim placement issue. You know, would you just spell that out in English, because I don't quite understand what the heart of your position is. I'd be happy to. The stay put is governed by federal law. 20 U.S.C. 1415J says that the student is entitled to stay in the then current educational placement. Courts have consistently interpreted this to mean the placement the student was actually in, the functioning placement at the time of the dispute. The reason for this is that it's an automatic injunction. It's like the automatic stay. Okay. Well, let me put it somewhat differently. I mean, I understand the legal stuff, but I don't understand how it plays out in this case. If I understand your argument, it's basically that somehow you're better off if the judge had found a stay put instead of an interim placement as being sort of functionally equivalent is the best way I can put what I think he did. He just said, you know, whatever, it's functionally equivalent. Why are you better off one route than the other? We're better off because the stay put being an automatic injunction, there is no law that provides that there's an equitable reduction in the reimbursement. Why? Isn't it always under the rubric of appropriate relief? No. Not for stay put. Stay put is an absolute unqualified, you get it, you keep it, they have to fund it. There's no, and in fact, this court is the What statute says that? I'm sorry? Which statute says that? It's the Supreme Court in Honig v. Doe that says it's an unequivocal right. Honig v. Doe. Because I had the exact same question as Judge Reimer. Does it matter? Honig v. Doe is the, and it's cited in our pleading paper somewhere, is the fundamental case on stay put. That's where the Supreme Court said a stay put is unequivocal. The student is entitled to it. It doesn't matter what the story is. The stay put applies. Okay. And Judge, just to be perfectly clear, and Judge Wilson ordered the reimbursement under what theory? He ordered it under the theory that they didn't offer an appropriate stay put because they didn't offer an appropriate interim placement. And therefore, she was justified in, Mrs. Termini was justified in making a private placement, and that gets all into the equitable reimbursement for a private placement, which is under the Burlington Doctrine. So when you're being reimbursed for a private placement, that's where the equities come into play and where you can get a reduction. But if it's a stay put, there is absolutely no authority, no case ever has held that there's an equitable consideration on how much of the stay put you pay. In fact, this Court, the Ninth Circuit, in Clovis, held that even if the hearing officer was wrong in a stay put situation, if the stay put resulted from a hearing officer decision and later the hearing officer was wrong, the stay put still applies and the school district pays for it and there's no reimbursement because it's an automatic absolute injunction. Okay. I'd like to address that. 34 CFR section 300.403D3 indicates that the tuition reimbursement can be reduced based upon what I'm going to call misconduct of the parent or the parent's attorney. Also in section 1415, 20 U.S.C. 1415, I'm looking at subsection F. It talks about reduction in the amount of attorney fees except as provided in subparagraph G whenever the court finds that the parent or the parent's attorney during the course of the action or proceeding unreasonably protracted the final resolution of the controversy, then it can be reduced. Isn't that correct? But none of those are stay put situations. Neither statute applies to a stay put. The CFR section you read applies to reimbursements for private placements. A stay put is not a reimbursement for a private placement. Okay. So you're saying that the stay put reimbursement is separate from those two. In fact, the stay put really is not even a reimbursement. What the stay put really is is the school district has to step up and pay for it right then. Right. And the reason for that is that you have many families who don't have money to fund private placements. So if parents had to go out and privately fund a stay put and then get reimbursed, it would be a meaningless right, as it would have been here, but for the litigation that took place. So the CFR regulation I cited in the statute, in this case, I'd be very interested in your take on this. I'm very troubled by the conduct of the parent in this case and to some degree the attorney, not you, but in the earlier proceeding. There's no question it protracted things. It made it more difficult. Whether they were legally right or not, they made it very difficult. How do you interpret or construe the law in terms of the ability of this court to, in effect, sanction, if you will, Mrs. Termini for her conduct without affecting the child, per se? Well, Your Honor, the sanction was applied. It was applied in the hearing office. That's the half year. That's right. And the reason for that, Your Honor, is that, in fact, in February, and the record is very clear on this, Mr. Weiner wrote a letter to the school district and said, we're ready to have an IEP meeting, and here's a bunch of dates. You know, let's have an IEP meeting. We're prepared to do it. You know, he just had a hearing in front of Judge Wilson. Judge Wilson had scolded him for not being more cooperative. He said, fine, I've learned my lesson. We're going to cooperate. Here's, you know, several dates. The school district didn't respond. They didn't even answer that letter until several of the dates had already expired. They chose instead to try to make a settlement offer. Okay, but you're, Mrs. Termini, you're addressing their conduct. What I'm asking now, just put for a moment that there was misconduct from at least my perspective. What is your construction of the law? What right does this court have aside from the half semester reduction in reimbursement that was imposed by the CEHO, I believe? And affirmed by? And affirmed by the district court. What right do we have under either of these statutes or any other statute to, in effect, sanction this conduct? Well, I guess you would have to find that Judge Wilson was in error in affirming the CEHO decision that, and that I think would be an abusive discretion standard. It's an equitable determination. He agreed with the equitable determination. It was an exercise of equity. And basically what it was is, look, okay, you delayed from October until February. But in February, you turned around and started cooperating. So we're going to ding you half the reimbursements. And that was the rationale. That was the exercise of equitable determination. Judge Wilson agreed with it. And this court, if this court believes that's an abusive discretion, could change that. If you're right, then what is the actual practical consequence in terms of reimbursement for each of the periods that are involved? Or does it go all the way through? Or does it just pertain to the? It would. We believe it would start in October and go through until Judge Skarda's decision in July. And it would basically double the payment that was made to Westmoreland. So it would go from October through the July. Right. Okay. And the second question is, to what extent, if any at all, is our mandate in the prior appeal implicated by your argument? Because it can sort of be read as saying, look, the stay-put order is all intermeshed and interrelated. And Judge Wilson could well have read that and said, ah, well, it's all intermeshed and interrelated, so I'm just going to treat them as functionally the same. Well, actually, Judge Wilson had a difficult time interpreting the remand order. I know that. And at first he interpreted it as saying, look, you know, the only real issue here is, was it possible for them to keep her at Westmark within their existing resources? And it was very clear that it was. There was testimony. Mr. Lieberman, who was the director of special education, testified, absolutely, if we had to put her at Westmark, we could have put it at Westmark. We put lots of kids in nonpublic schools. So, you know, we briefed that. And then he said, well, maybe they meant something a little bit different. I think that the remand order is a little ambiguous. It doesn't say, it does not hold that the stay put is identical to the interim placement. It says that they're closely related. And there's a factual issue here. Now, one of the facts that can be, that was of concern, I think, to the court the last time is, was it in fact possible in any reasonable way to keep Asia at Westmark for a stay put placement? Because if it wasn't, if Westmark was way far away and, you know, there was a long commute that would interfere with her school day or, you know, some other good reason why Hart just simply couldn't do it, that record was not developed at the time of the first hearing. That record was developed at the time after the remand as part of the due process case, because possible was also of an issue in respect to the interim placement. So we believe that the remand order can reasonably be read to say, look, was it possible to implement the stay put? If it wasn't possible to implement the stay put, and sometimes it isn't, what happens sometimes is schools burn down. Sometimes children age out of placements. And then the court says, well, it's not possible to give the exact placement, so we'll give something as close as possible. So I think that that remand order can reasonably be read in that fashion. There was some discussion before about Asia dropping out, in effect. Is that correct? She is no longer in school? Well, Asia, in fact, is no longer at Westmark. Nothing, by the way, that happens here will have any impact on that. I understand that. I just want to understand the context. Right. She is 18 years old, so it's up to Asia what to do with her education. I understand she was ill, and the reason she did not complete the year at Westmark was due to illness. One of the requirements for ending special education responsibility is getting a high school diploma, which in the state of California requires passing the high school exit exam. She has not passed the high school exit exam. So units or no units, there's no way Asia can graduate without a high school diploma, and the school district's responsibility to provide her with special education services will continue probably until age 22. Okay. I don't know whether it should be affirmed on mootness grounds, judicial estoppel grounds, or none and just go to the merits. Well, the mootness situation arises because of the stay put, once again. When Judge Trevor Skarda issued his decision in July 2002, he said they did not make a permanent placement offer, therefore the private placement was appropriate. Because of that holding under the Burlington case in the Supreme Court, Westmark became her stay put at that point. That stay put continued until the Gants decision was issued, because there was no agreed upon change of placement. When the Gants decision was issued in January 2004, she said yet again they did not offer her an appropriate placement, and the private placement at Westmark is appropriate, so we now have a new stay put that came into play. Now, what made this case moot was when the HART had an IEP meeting, and I think my opponent misspoke, Mr. Green misspoke, saying that they just gave up. They didn't. They actually had another IEP meeting with an IEP team, and that IEP team, apparently informed by Judge Gant's decision, where she laid out, it wasn't, I'm sorry, there was also a mischaracterization of Judge Gant's decision. She didn't say that Asia had been there so long and now she was too timid to move. What she said is, educationally, the needs of this child are so intense that they cannot be met in a special day class. Special day classes are larger. They don't have the same kind of one-on-one focus. This child needs one-on-one instruction that can only be applied in the non-public school context, not in the special day class. She also talked about her social-emotional needs and said she's finally coming out of her shell. This child had had severe emotional problems. She's a very pretty young girl. She wanted to have friends. She tried to make friends. When they saw that she was going into the special day class, they started calling her dummy and making fun of her, and she took it very hard to the point where she started having somatic illnesses. So this child really needed to be in a more protected environment because of her social-emotional needs. She used to hide in the bathroom between classes so nobody would see her go into the special day class. And, you know, if anybody, if you remember recess and lunch, that can be pretty brutal, the way kids treat each other, and this child had emotional issues. So for all of these reasons, as laid out very clearly in Judge Gant's decision, the IEP team, and this is a group of teachers, this is a combination of her teachers, her teachers from Westmark, the school administrator, the parent, agreed at that point, you know, you're right. We've been fighting this battle, and we're wrong. She needs to be placed at Westmark. When they did that, we look at the case and say, well, what do they get if they win a reversal of Gant's decision? Under Clovis, the stay put doesn't get reimbursed for the period up to Gant's decision. From the period after Judge Gant's decision until the IEP, she's on a stay put, and that can't get reimbursed. What remedy do they have? Okay. That's why it's moved. Are there any other questions I can address for the Court? I don't think so. Not for me. I believe I might have a little more time for possibly, because it's cross appeals, a rebuttal, but I'll sit down for now. Do you have anything else? Okay. Well, Mr. Green. Thank you. Briefly, just three areas I wanted to cover. First of all, with respect to the comments that, you know, we did nothing after February of 2002 when Mr. Weiner finally indicated they'd be prepared to talk about an IEP. I think the record is the contrary, and I want to just point the Court to it. ER1, 171 to 172, and 188 to 210, as well as our opening brief, which lays it out at 71 to 78. Second thing I wanted to address briefly is the stay put argument. The questions from the Court initially, the first question is for Ms. Tiffany. Essentially, there are two cases. The first case was completely unnecessary, the injunction case, the stay put case. What they wanted to establish in that case is as soon as you're in a nonpublic school and you come into a new district, ipso facto, the school district must pay for that nonpublic school. That's the point they wanted to make in the first case, because we didn't need the first case. You could have just had district magistrate's placement offer. They say it's inappropriate. We go to due process. That would have been a normal case. But they wanted that first case to establish that there's an automatic entitlement. And we maintain, and I think Judge Wilson agrees, that's why they're cross-appealing, that there isn't any ipso facto right like that to have stay put in an NPS, just because you come in from an NPS, if the school district is implementing to the extent possible within existing resources. So that was the second point I wanted to make. And you contend that you did? Well, we contend we did, but leaving aside that on the legal issue, we contend that the legal argument that it must be is wrong, regardless of what we had done. Right. But we have to deal with the facts of this case. So if she did not get what the law required, then she had a right to remain where she was, correct? She had a right to challenge it and under Burlington seek reimbursement for it. Right. And they did that, in effect. Well, yes, they did. They did do that part of it, but the first case said shift funding because ipso facto, she's in a non-public school, she has to stay there. Right. And you're just saying it's not automatic. That's correct. Okay. And it's important because that was half the cost of this case. More, two-thirds of this case involves that first lawsuit that didn't have to be brought. And now it's, I think Judge Wilson has stated, and I hope this Court will affirm that for other school districts out there, that that is not the law, that there is no ipso facto requirement to that effect. The last point I wanted to make was on the second terminating appeal. I didn't think it was appropriate for us to get into, for my learned colleague, to get into the merits of that case, talking about what Asia's needs are, because we didn't get to the merits in that case. I realize on the mootness that that's a legitimate argument to talk about what Asia's needs were five years earlier when she was pulled. What happened five years earlier, according to record, is that mother was keeping her home from school. She wasn't letting her go to school. There are even findings to that effect in the Glendale IEP. The conduct that occurred in this case by Ms. Termini isn't just isolated to our situation. It happened in Glendale, too, where a child was being kept out of school. And I understand there are some other possibilities about why Asia's not graduated from school, but I will avoid getting into that at this point. On the mootness issue, we do not believe that statehood was established as having been at heart. And as of September of 2002, we think that the hearing officer was very clear that he did not order prospective placement. He ordered simply placement for the summer, and we think there are factual issues that need to be addressed. Judge Otero seems to have went back and forth between saying it was a 12B6 on the pleadings and then sort of getting into the merits on it. It was sort of back and forth, and we understand it was good intention, but we think that was error, and that should be vacated. If there are no further questions. Thank you. Mr. Green, Ms. Tiffany, do you have anything just on the cross-appeal? My only response would be that with respect to this prospective relief that wasn't ordered, it's not necessary to be a statehood. There's nothing in Burlington that says you have to order prospective relief. What Burlington said is if there's a determination the school district didn't offer FAPE, the parent did a private placement, and the hearing officer agrees, then that constitutes a new agreed-upon placement for purposes of statehood, period, end of story. There's no, and he has to order prospective relief. All right. Thank you, counsel. Both of you. The matter just argued will be submitted, and the Court will stand in recess for today.
judges: Rymer, Wardlaw, Smith